FIRESTONE GREENBERGER PLLC
*Attorneys for Plaintiff Robert G. Mackie*
Michael J. Firestone (mjf@firegreenlaw.com)
Jordan Greenberger (jg@firegreenlaw.com)
Callie J. Kramsky (ck@firegreenlaw.com)
104 West 40th Street, 4th Floor
New York, NY 10018
(212) 597-2255

UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ROBERT G. MACKIE, in his individual capacity and derivatively on behalf of BOB MACKIE DESIGN GROUP LTD., <br><br> Plaintiff, <br><br> -against- <br><br> MARC SCHWARTZ and BOB MACKIE DESIGN GROUP, LTD., <br><br> Defendants, <br><br> -and- <br><br> BOB MACKIE DESIGN GROUP LTD., <br><br> Nominal Defendant. | Case No. 25-cv-9015 <br><br> **COMPLAINT** <br><br> <u>JURY TRIAL DEMANDED</u> |

Plaintiff Robert G. Mackie a/k/a Bob Mackie ("Plaintiff" or "Mr. Mackie") by and through his undersigned attorneys, brings this Complaint against Defendant Marc Schwartz ("Mr. Schwartz") and Defendant and Nominal Defendant Bob Mackie Design Group Ltd. ("BMDG," or the "Company,"), and in support thereof pleads as follows:

## <u>INTRODUCTION</u>

1.      Mr. Mackie is an internationally famed costume and fashion designer whose iconic career spans over six decades.  Mr. Mackie is the winner of a Tony award, multiple Emmy

awards, the Costume Designers Guild Career Achievement Award, and a lifetime achievement award from the Council of Fashion Designers of America (CFDA).  He was also nominated for multiple Academy Awards.  Among the many performers who have worn Mr. Mackie's designs are Cher, Carol Burnett, Mitzi Gaynor, Tina Turner, and Bette Midler.  In recent years, a new generation of celebrities has embraced his work and worn his designs, including Pink, Miley Cyrus, Zendaya, and Taylor Swift.  In fact, Taylor Swift wears an outfit designed by Mr. Mackie for the long-running Las Vegas revue *Jubilee!* on the cover of her recently released album *The Life of a Showgirl*.  Mr. Mackie's singular life and career was itself the subject of a recently released documentary entitled *Bob Mackie: Naked Illusion*.

2.      Mr. Schwartz is the majority shareholder and chief operating officer of Defendant BMDG, a New York corporation formed in 1997.  Until December 2024, Mr. Schwartz also managed Mr. Mackie's personal finances under a power of attorney granted to him by Mr. Mackie in 2014.

3.      Because of Mr. Mackie's prominence in the world of entertainment and fashion, his name, brand and signature have unique value.  Accordingly, over the years BMDG entered into partnerships with third parties to sell products associated with Mr. Mackie's name and brand, and it sought and obtained federal trademark registrations for marks that include Mr. Mackie's name (in whole or in part), signature, image or likeness, and combinations thereof, on various good.

4.      From the time of BMDG's inception, it was always contemplated that Mr. Mackie would control how and when BMDG associated his name, brand, and signature with any products or business partners.  Indeed, maintaining control over how his name is used in the marketplace is of supreme importance to Mr. Mackie, particularly now, as he contemplates his legacy at the end of a wildly successful and notable career.

5.    This action is necessary so that Mr. Mackie can reassert control over his legacy, which Mr. Schwartz has sought to exploit for his own purposes.

6.    Mr. Schwartz fits the textbook example of a faithless fiduciary.  He has caused BMDG to take out millions of dollars of debt without adequately explaining the purpose of such loans, failed to maintain BMDG's financial records so that it is impossible to determine how the loans were used, failed to file BMDG's corporate tax returns, wrongfully claimed ownership over valuable works authored by Mr. Mackie so that he can sell them for Mr. Schwartz's own personal benefit regardless of how Mr. Mackie wishes to dispose of them, impermissibly sought to register trademarks using Mr. Mackie's name and likeness over Mr. Mackie's stated objections and by using a purported written consent that contains an obvious forgery of Mr. Mackie's signature, licensed Mr. Mackie's name and iconic signature to a third party without Mr. Mackie's consent, and flagrantly breached BMDG's bylaws (the "Bylaws") by failing to obtain the consent of BMDG's board (which includes Mr. Mackie and whose consent is required for the board to act) for material and significant business decisions.

7.    Upon information and belief, Mr. Schwartz also took advantage of his rights under the power of attorney by paying BMDG's business expenses with Mr. Mackie's own personal funds.  Indeed, nothing appears to be out of bounds for Mr. Schwartz: he even withdrew funds from bank accounts that Mr. Mackie set up for the benefit of his great-granddaughters so that he could purportedly pay BMDG expenses, without telling Mr. Mackie that he was doing so.

8.    Mr. Mackie and Mr. Schwartz first attempted to resolve their dispute by submitting it to arbitration in March 2025.  However, the arbitration was terminated after Mr. Schwartz – in material breach of the parties' arbitration agreement – failed to pay the arbitrator his fee.  Mr. Schwartz has therefore waived arbitration.

9.      In this action Mr. Mackie alleges the following claims against Mr. Schwartz, all of which are discussed below in greater detail.

10.      <u>Accounting</u>: Mr. Mackie seeks records concerning the loans and income of BMDG, including a description of how the loan funds were used.

11.      <u>Direct Claim for Breach of Fiduciary Duty</u>: Mr. Schwartz breached his fiduciary duty to Mr. Mackie by seeking to license his name, image and likeness without Mr. Mackie's consent, and did so at a time when Mr. Schwartz knew that Mr. Mackie did not want to pursue new licensing deals or future business with BMDG.  Mr. Schwartz's breach is so egregious that Mr. Mackie seeks punitive damages with respect to this cause of action.

12.      <u>Derivative Claim for Breach of Fiduciary Duty concerning BMDG's finances</u>: Mr. Schwartz cannot explain why BMDG took out so much debt and how the funds were used, nor has he caused BMDG to maintain adequate and accurate financial books and records.  Such breaches damaged BMDG.

13.      <u>Removal of Mr. Schwartz as a Director and Officer of BMDG</u>:  In light of Mr. Schwartz's various failure and breaches, cause exists to remove Mr. Schwartz as a director and officer of BMDG under Sections 706(d) and 716(c) of the New York Business Corporation Law (the "BCL").

14.      <u>Declaratory Judgment concerning Ownership of Works Authored by Mr. Mackie and Trademarks Associated with Him</u>: Mr. Mackie seeks a declaration that he, not BMDG, is the owner of an archive (the "Archive") of sketches and other works authored by Mr. Mackie, along with the copyright and intellectual property associated with such items.  Additionally, the Court should declare that BMDG has abandoned and has no rights in certain Bob Mackie-related trademarks.

15.      <u>Cancellation of Trademarks</u>: The Court should cancel or strictly limit two

trademarks registered by BMDG, and prohibit a new pending trademark application by BMDG – all of which are associated with the name "Bob Mackie" – on the grounds that Mr. Mackie did not provide his written consent as required under Section 2(c) of the Lanham Act.

16.    Permanent Injunction: BMDG should be permanently enjoined from using Mr. Mackie's name, signature, image or likeness for commercial purposes, including as a trademark, or to suggest that he endorses or approves of any goods or services.

17.    Accounting for Mr. Mackie's Personal Finances: As Mr. Mackie's former fiduciary and attorney-in-fact, Mr. Schwartz is obligated to provide such an accounting upon demand with respect to all transactions made pursuant to the power of attorney.

18.    Breach of the Arbitration Agreement: Mr. Schwartz breached the Arbitration Agreement by failing to pay his share of the arbitrator's fees.  As a result, Mr. Mackie was damaged in the amount that he paid the AAA and the arbitrator, i.e., $11,172.

19.    Fraud in the Inducement: Mr. Schwartz fraudulently induced Mr. Mackie to enter into an arbitration agreement by agreeing to share the costs of arbitration.  Mr. Schwartz never had any intention of paying his share, which caused the arbitration to be terminated.  Mr. Mackie was damaged in an amount to be proven at trial but not less than $20,000, which represents his attorneys' fees in connection with the arbitration.

## **PARTIES**

20.    Mr. Mackie is an individual domiciled in and a resident of Riverside County, California.  Mr. Mackie is a 40% shareholder of BMDG and a member of the Board.

21.    Upon information and belief, Mr. Schwartz is an individual domiciled in and a resident of Putnam County, New York, and therefore within the jurisdiction of this Court.  Mr. Schwartz is a 60% shareholder of BMDG and a member of the Board.

22.    BMDG is a New York corporation, which according to the New York Secretary

of State is headquartered in New York County, New York, and therefore within the jurisdiction of this Court.

## JURISDICTION AND VENUE

23.     Pursuant to 28 U.S.C. §§ 1331 and 1338, the Court has subject matter jurisdiction because certain claims in this action arise under the Lanham Act (15 U.S.C. § 1051 et seq.) and the Copyright Act (17 U.S.C. § 101 et seq.).

24.     With respect to the state law claims pleaded herein, the Court has (i) diversity jurisdiction pursuant to 28 U.S.C. § 1332(a)(1) because they involve citizens of different states and the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs and/or (ii) supplemental jurisdiction over the related state law claims pursuant to 28 U.S.C. § 1367.

25.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)- (c) and § 1400(a) because, *inter alia*, the events giving rise to the claims occurred in this district, Defendants may be found in this district, and Defendants are subject to personal jurisdiction in this district.

## FACTUAL ALLEGATIONS

A.      The Formation of BMDG

26.     Mr. Mackie's career as a fashion designer began in the 1960s when he was employed at the Paramount Studios costume department.  His work soon became highly in demand, and he designed costumes for the Sonny & Cher and Carrol Burnett shows, and for various live musical shows featuring, among others, Mitzi Gaynor, Diana Ross, and Whitney Houston.  Perhaps his most famous and instantly recognizable gowns were worn by Cher to the Academy Award ceremonies in 1986 and 1988.

27.     From the mid-1960s through the 1990s, Mr. Mackie operated his costume design and couture businesses together with his creative partner Ray Aghayan through various corporate

entities referred to herein as the "Mackie Businesses."

28.     While both Mr. Mackie and Mr. Aghayan were involved in the creative process, it was Mr. Aghayan who was primarily responsible for managing the Mackie Businesses' finances and operations.

29.     Upon information and belief, in the mid-1990s it was determined that the Mackie Businesses needed to be refinanced.

30.     Mr. Mackie and Mr. Aghayan knew Mr. Schwartz from prior business dealings and asked him to assist them in refinancing the various businesses in which Mr. Mackie was involved.  As part of the refinancing, it was agreed that Mr. Schwartz would partner with Mr. Mackie.

31.     Thus, on or about March 20, 1997, BMDG was formed as a New York corporation.

32.     Upon BMDG's formation, it purchased the stock of two companies holding certain Bob Mackie-related trademarks for $2 million.

33.     Despite Mr. Mackie's repeated requests, Mr. Schwartz has not identified which Bob Mackie-related trademarks were owned and sold by the Mackie Businesses at the time of the transaction; nor has Mr. Schwartz specified to Mr. Mackie which Bob Mackie-related marks BMDG may have used in commerce (and in connection with which specific goods/services) over the years and which such marks have been abandoned by BMDG.

34.     The USPTO records indicate that certain Bob Mackie-related trademark registrations and applications for registration are "DEAD" (Registration Numbers 1402250, 1811905, 1940358, 1250291, 1141656, 1145809, 1387192, 1823766, 3464000, 1325937, 2155562, and 4515428; and Serial Numbers 75846460, 86873548 and 75482097).

35.     Despite Mr. Mackie's request, Mr. Schwartz has not clarified whether BMDG

claims to still have rights in such marks and the associated goods/services, notwithstanding them being "DEAD" before the USPTO.

36.    The Board of BMDG consists of Mr. Schwartz and Mr. Mackie.  Mr. Schwartz publicly identifies himself today as BMDG's chief operating officer and general counsel.

37.    BMDG's Bylaws provide that the Board manages and controls the business and affairs of BMDG and that the Board acts by consent of a majority of directors.  Thus, Mr. Mackie and Mr. Schwartz must consent for the Board to act.

38.    Accordingly, Mr. Mackie's consent is required for BMDG to use marks that incorporate his name, signature, image or likeness (in whole or in part and any combinations thereof).

39.    Mr. Mackie's consent is also required for BMDG to enter into any transaction that involves the use or licensing of Mr. Mackie's name, brand or other intellectual property associated with him.

40.    At the time of the Company's formation, Mr. Schwartz received 51 of BMDG's 100 shares and Mr. Mackie received the other 49.

41.    On or about June 8, 2001, Mr. Mackie transferred 9 of his shares to Mr. Schwartz. At that point, Mr. Schwartz became a 60% shareholder of BMDG and Mr. Mackie a 40% shareholder.

42.    From the start of BMDG's incorporation, Mr. Mackie's attention was focused on the creative side of the business.  Mr. Mackie relied on and trusted Mr. Schwartz to manage BMDG's day-to-day business and operations.

43.    Upon information and belief, on or about November 20, 2006, the Board held a special meeting at which it determined that Mr. Mackie had "officially retired" and that any compensation that they received from BMDG would be in the form of "reimbursed expenses,

including all travel costs, meals, entertainment, and other personal expenses such as American Express charges."

44.    Upon information and belief, Mr. Mackie never signed a work-for-hire agreement with BMDG and he was never a BMDG employee, either before or after his "retirement" in 2006.

C.    BMDG Purports to Purchase Various Mackie Assets

45.    On information and belief, or about March 11, 2007, Mr. Schwartz drafted a "memo to file" in which he referenced a meeting between himself and Mr. Aghayan in Los Angeles, which memo stated that "in accordance" with that meeting, ownership of "all archives" would be transferred to BMDG.

46.    The memo identified the archives as including the couture collection and rental costumes owned by certain of the Mackie Businesses, and costumes designed by Mr. Mackie that had been worn by various celebrities.  The memo also stated that the archives included the thousands of sketches drawn by Mr. Mackie for the gowns, dresses, and costumes he had designed over the years.  The memo also stated that "formal transfer/assignment documents" would be created at a later date.  The extent of Mr. Aghayan's authority to enter into such an agreement is unknown and may have constituted an *ultra vires* act.

47.    Upon information and belief, these items were never actually transferred to BMDG – either physically or pursuant to a written transfer/assignment agreement.  Indeed, the sketches have always been in Mr. Mackie's personal possession and/or control, both before and after Mr. Schwartz drafted the memo, and Mr. Schwartz has not provided Mr. Mackie with any type of "formal transfer/assignment document."

48.    Additionally, on information and belief, on or about March 11, 2007, Mr. Schwartz and Mr. Aghayan executed documents purporting to transfer to BMDG the copyrights

purportedly owned by certain Mackie Businesses relating to Mr. Mackie's original sketches, celebrity costumes and outfits, the rental costumes and outfits, and the couture items. The extent of Mr. Aghayan's authority to transfer the copyrights to BMDG is unknown and may have constituted an *ultra vires* act.

49.     Moreover, on information and belief, certain of the copyrights that Mr. Schwartz and Mr. Aghayan believed were owned by the Mackie Businesses may not in fact have been owned by the Mackie Businesses. For example, on information and belief, certain of the works may have been, pursuant to copyright law, works for hire in favor of third-parties (e.g., a television production company or network) such that those third-parties would be deemed the "authors" and original owners of the works. Or, on information and belief, the works were not works for hire in favor of the Mackie Businesses because Mr. Mackie was not an employee of those companies, and to the extent they were specially commissioned there was no work for hire agreement signed by Mr. Mackie. To the extent the Mackie Businesses did not own those copyrights, they had no such title or rights to convey to BMDG, as one cannot convey rights that one does not own.

50.     Additionally, even if the physical items were transferred to BMDG, ownership of the copyright was not transferred by the March 11, 2008 documents, and vice versa. Pursuant to 17 U.S.C. § 202, "Ownership of a copyright, or of any of the exclusive rights under a copyright, is distinct from ownership of any material object in which the work is embodied. Transfer of ownership of any material object, including the copy or phonorecord in which the work is first fixed, does not of itself convey any rights in the copyrighted work embodied in the object; nor, in the absence of an agreement, does transfer of ownership of a copyright or of any exclusive rights under a copyright convey property rights in any material object."

E.     Mr. Schwartz Fails to Pay BMDG's Expenses

51.     In 2020, QVC, the televised shopping channel, ended a long-running business relationship with Mr. Mackie and BMDG.

52.     In 2022, Mr. Mackie – by now in his 80s – stopped designing new gowns and costumes for his clients.

53.     Starting in January 2023, BMDG routinely failed to pay or was late in paying various expenses on Mr. Mackie's behalf, including his dues to the Costume Designers Guild (which provides one of Mr. Mackie's pensions).

54.     BMDG failed to pay rental fees at a Palm Springs storage facility, where certain physical items from the Mackie Businesses are kept with items designed by Mr. Mackie that belong to one of his celebrity clients.  That client had been making direct cash payments to BMDG to cover her share of the monthly fees.  Upon information and belief, the funds provided by the client were diverted by Mr. Schwartz for other purposes.  As a result, Mr. Mackie used, and continues to use, his personal funds to pay the rental fee.

55.     In or about March 2023, BMDG cut by half the salary paid to a BMDG employee who worked closely with Mr. Mackie; that employee has not been paid since May 2024.

56.     In or about October 2023, BMDG stopped making regular payments to the public relations professional who had worked for Mr. Mackie for years.  That person has not been paid anything by BMDG since April 2024.

57.     In March 2024, Mr. Schwartz asked Mr. Mackie to take out a $150,000 mortgage on his home in Palm Springs, California.  Mr. Schwartz said that the funds were "necessary" for BMDG's business, and Mr. Mackie agreed to do so.  Mr. Schwartz never provided Mr. Mackie with any additional details concerning the use of the funds.

58.     Upon information and belief, Mr. Schwartz used the loan proceeds to cover

BMDG's expenses, yet he did not cause BMDG to enter into an agreement with Mr. Mackie memorializing that transaction or its terms.

F.     Mr. Schwartz Fails to Act Faithfully on Mr. Mackie's Behalf

59.     In March 2014, Mr. Mackie granted Mr. Schwartz authority over his personal finances via a durable power of attorney under California law (the "POA").

60.     Pursuant to the terms of the POA, Mr. Schwartz gained access to all of Mr. Mackie's personal bank accounts and took charge of paying Mr. Mackie's bills and overseeing his personal finances, including the preparation and filing of his tax returns.

61.     Thus, in addition to the fiduciary duty that he owed Mr. Mackie through BMDG, Mr. Schwartz now took on an additional layer of fiduciary obligations to Mr. Mackie as his attorney-in-fact under California law.  Pursuant to California law, Mr. Schwartz was now required to act solely in Mr. Mackie's interests and to avoid any conflicts of interest.

62.     Pursuant to the POA, Mr. Schwartz for many years took responsibility for handling Mr. Mackie's personal finances, including paying his bills.  Starting in around 2020, Mr. Schwartz failed to pay certain of Mr. Mackie's personal expenses, including the real estate taxes on Mr. Mackie's home in Palm Springs.

63.     Mr. Schwartz also failed to authorize payments on the home mortgage which he had convinced Mr. Mackie to take out, which caused foreclosure notices to be sent to Mr. Mackie by the mortgagee lender.

64.     On September 12, 2024, Mr. Mackie learned that Mr. Schwartz, purportedly acting pursuant to the POA, had withdrawn funds – without any prior notice to Mr. Mackie or authorization from him – from custodial accounts established by Mr. Mackie for the benefit of Mr. Mackie's great-granddaughters.

65.     Upon information and belief, Mr. Schwartz used the funds that had been given to

Mr. Mackie's great-granddaughters to instead pay BMDG's expenses, in violation of his

fiduciary duties to Mr. Mackie under the POA and in violation of his fiduciary duties to BMDG

to not use unlawfully obtained funds.  Mr. Schwartz has since admitted to invading the accounts.

66.     On or about December 10, 2024 Mr. Mackie revoked the POA.

G.     Mr. Mackie Demands Books and Records and an Accounting

67.     In light of Mr. Schwartz's failure to make payments when due, Mr. Mackie

determined to investigate BMDG's financial situation.  Thus, on September 3, 2024, Mr.

Mackie, through counsel, informally requested that BMDG produce various books and records,

including BMDG's financial statements for the past three years.

68.     In response, Mr. Schwartz produced, among other things, balance sheets and

income statements for 2023, and an income statement for the first six months of 2024.

69.     The balance sheet showed that Mr. Schwartz had loaned more than $600,000 to

BMDG, and that there was nearly $500,000 owed to other "Lenders" without identifying them

by name.

70.     The financial statements also valued an "Archive" of Mr. Mackie's work at $2.2

million.   No list identifying the contents of that alleged "Archive" has been provided, and

whether the valuation is accurate is unknown to Mr. Mackie.

71.     On September 20, 2024, Mr. Mackie's counsel made a formal demand for books

and records to supplement the materials that had already been produced.

72.     In response to Mr. Mackie's formal books and records demand, Mr. Schwartz

caused BMDG to produce certain additional documents, including among other things BMDG's

bank statements from 2019-2024 and three alleged promissory notes between BMDG and Mr.

Schwartz.  Mr. Schwartz also admitted that BMDG had not filed any tax returns for 2022 and

2023, which exposes BMDG to potential liability.  Additionally, Mr. Schwartz admitted that

BMDG has no general ledgers for any year of the last six years, and no income statements or balance sheets for any year except 2023.

73.     The three alleged promissory notes between BMDG and Mr. Schwartz are dated January 1, 2020, January 1, 2023 and January 1, 2024 for a total amount of $700,000 in loans.  In an email to Mr. Mackie's counsel, Mr. Schwartz stated that these loans were "needed to cover expense shortfalls over a five year period.  These funds covered shortfalls in payroll, insurance premiums, loan payments, consultant fees, and general administrative expenses.  These loan transactions were made in many small transactions over the five year period, and not in lump sum deposits."

74.     Mr. Schwartz did not identify any particular transactions on the bank account statements which represented amounts that he loaned to the company.  Additionally, BMDG has no general ledgers.  Accordingly, it is impossible to verify whether the amounts claimed by Mr. Schwartz to be loans were actually used for the purposes identified by Mr. Schwartz.  In any event, it was impermissible for Mr. Schwartz to loan personal funds to BMDG without involving the Board and ensuring the entire fairness of the transaction.  Yet Mr. Mackie did not know of such loans until years later, when he requested books and records.

75.     The bank statements produced by BMDG also show large deposits of cash into BMDG between 2020 and 2022.  In particular:

- $149,900 on June 11, 2020;

- $100,000 on July 22, 2020;

- $100,000 on April 1, 2021;

- $350,000 on July 29, 2021;

- $730,000 on December 27, 2021 (followed by a withdrawal of $700,000 on December 29, 2021); and

- $617,000 on December 23, 2022.

76.     When asked to provide an explanation for these deposits, Mr. Schwartz stated that they "are all capital investments in BMDG by my resources to fund BMDG's investment in a drastic COVID switch to ecommerce [sic], including Amazon, QVC.com and Overstock.com." However, the bank statements indicate that these funds came from Small Business Administration loans and/or a non-profit lender – not from Mr. Schwartz.

77.     Mr. Schwartz also stated that such funds "are not deemed loans on BMDG's balance sheet, but capital investments with potential future profit distributions."  However, the 2023 balance sheet produced by BMDG did not identify any capital investments.  Nor did Mr. Mackie, as a member of the Board, authorize any capital calls or new investments in the Company.

78.     Mr. Schwartz explained that the $700,000 transferred out of BMDG on December 29, 2021 was for an apparent division of BMDG known as Bob Mackie Interactive Ltd. ("BMI"). Upon information and belief, BMI is a New York corporation formed by Mr. Schwartz in August 2020 for the purpose of selling products directly to consumers.  Mr. Schwartz has not identified or produced any of its financial records or identified its owners.  Despite this significant investment, Mr. Schwartz claims that BMI had minimal revenues.

79.     Mr. Mackie also demanded that Mr. Schwartz provide a full and complete accounting of all transactions that he had entered into on behalf of Mr. Mackie or members of his family (e.g., his great-grandchildren), for the past six years.  Such accounting was to include a record of all funds that Mr. Schwartz transferred (or authorized to be transferred) into or out of any bank and investment accounts owned, controlled, or opened by Mr. Mackie or for his benefit, and the origin and destination of such transfers.

80. Mr. Schwartz failed to provide an accounting. Rather, he provided certain bank account statements and handwritten summaries of expenses for 2023 and 2024 without identifying the sources which paid such expenses. The summaries and account statements fail to account for the sources and uses of Mr. Mackie's income (i.e., his payments from social security and pensions). Put simply, Mr. Schwartz has not been forthcoming concerning his management of Mr. Mackie's personal funds, and his actions indicate that he has failed to meet his fiduciary obligations to Mr. Mackie.

I.      The Terminated Arbitration Proceeding

81. By late 2024, Mr. Mackie informed Mr. Schwartz that he believed that Mr. Schwartz had engaged in wrongdoing if not serious financial mismanagement, and that he wished to terminate their business relationship, cease any further involvement with BMDG, and no longer associate his name and brand with Mr. Schwartz and BMDG. As the parties were unable to resolve their differences (but desired to maintain their privacy), they decided to submit their dispute to arbitration.

82. On March 3, 2025, Mr. Mackie, Mr. Schwartz and BMDG entered into the Arbitration Agreement, by which they agreed to refer any disputes between them to the American Arbitration Association (the "AAA"). Paragraph 2 of the Arbitration Agreement provides that "Mackie and Schwartz each agree to pay one half of all Arbitration fees or costs assessed by AAA, including the arbitrator's fees. In the event of an uncured payment default, the parties agree that the arbitrator may enter a default judgment in favor of the non-defaulting party."

83. Three days later, on March 6, 2025, Mr. Mackie commenced an arbitration proceeding against Mr. Schwartz in which he asserted many of the claims pleaded in this action.

84. In the arbitration, Mr. Mackie sought a permanent injunction requiring Mr.

16

Schwartz to abide by the Bylaws and not make any decisions concerning BMDG's business and operations without involvement of the Board.  Thus, Mr. Schwartz was on notice that, regardless of what may have happened in the past, going forward he should not make any material business decisions without Mr. Mackie's consent.

85.    Immediately upon the commencement of the arbitration, the AAA required the payment of an initial administrative fee in the amount of $10,450.  Mr. Mackie paid his half.  Mr. Schwartz, however, claimed that he could not afford to pay his share even though he had agreed days earlier to the commencement of an arbitration in which he would pay half the fees.  As the AAA required this amount to be paid as a prerequisite to selecting an arbitrator, Mr. Mackie covered Mr. Schwartz's half without prejudice to his rights under the Arbitration Agreement.

86.    Following a preliminary conference in the arbitration, at which Mr. Schwartz admitted to the lack of general ledger for BMDG, the arbitrator issued an order directing the parties to agree on procedures to create a general ledger or the equivalent for BMDG.

87.    On June 24, 2025, Mr. Mackie and Mr. Schwartz entered into a stipulation (the "Accounting Stipulation"), which required, among other things, that Mr. Schwartz cause BMDG to provide a record identifying: (i) the dates, amounts, and sources of the funds borrowed by BMDG from January 1, 2019 to the present; (ii) the dates, amounts, and sources of all other income received by BMDG from January 1, 2019 to the present; (iii) the uses of the loan funds and the income, by identifying those persons and entities who received such funds and the dates and amounts of such payments; (iv) the purposes for which the loan funds and the income were paid to the Payees; (v) the balance of all amounts due to the lenders, and (vi) a description of the terms of such loans.

88.    The Accounting Stipulation was signed by the arbitrator overseeing the arbitration proceeding.  A copy of the Accounting Stipulation is attached hereto as Exhibit A.

89.     The Accounting Stipulation required Mr. Schwartz to provide all records by September 29, 2025.

90.     On June 18, 2025, the AAA issued an invoice requiring Mr. Mackie and Mr. Schwartz to each pay $12,962.50 for the arbitrator's retainer.  Mr. Mackie paid the amount.  Mr. Schwartz did not.

91.     After Mr. Schwartz's default of his payment obligation, the arbitrator informed the parties that he would terminate the arbitration within 30 days if the amount was not paid.

92.     Mr. Mackie requested that the arbitrator enter a default judgment against Mr. Schwartz, in accordance with the Arbitration Agreement, or, at the very least, that he issue an award requiring Mr. Schwartz to comply with the terms of the Accounting Stipulation.  The arbitrator declined to do either.

93.     On August 28, 2025, the arbitration proceeding was terminated by the arbitrator as a direct result of Mr. Schwartz's failure to pay his share of the arbitrator's fee.

94.     As of today, Mr. Schwartz has not caused BMDG to provide the records required under the Accounting Stipulation, and is therefore in breach of his agreement to do so.

95.     By materially breaching the arbitration, and thus causing the arbitration proceeding to be terminated, Mr. Schwartz waived arbitration.

J.     <u>Mr. Schwartz Wrongfully Seeks to Register BOB MACKIE as BMDG's Trademark</u>

96.     On May 28, 2025, while the arbitration was pending, Mr. Schwartz caused BMDG to file an application (the "Application") to federally register the mark BOB MACKIE (U.S. Serial No. 99205718) in international class 025 for apparel.

97.      Section 2(c) of the Lanham Act (15 U.S.C. § 1052(c)) provides in pertinent part that "No trademark … shall be refused registration on the principal register on account of its nature unless it … [c]onsists of or comprises a name, portrait, or signature identifying a

particular living individual except by his written consent…"

98.    Mr. Mackie did not provide his consent, written or otherwise, for the Application.

99.    Mr. Mackie does not consent to Defendants applying to register the mark BOB MACKIE in any classes of goods or services, and he does not consent to Defendants otherwise using or exploiting his name, signature, image or likeness for any purpose.

100.    The Application references a May 26, 2009, trademark registration for the mark BOB MACKIE (Registration No. 3626060, in class 003 for fragrances) and a June 21, 2021, trademark registration for the mark BOB MACKIE (Registration No. 6397590, in class 020 for pillows).

101.    Any consent that Mr. Mackie provided in connection with those registrations (Registration Nos. 3626060 and 6397590) does not constitute his consent for the pending Application.

102.    Any consent that Mr. Mackie provided in connection with those registrations (Registration Nos. 3626060 and 6397590) does not constitute his consent for or any other trademark application.

103.    Any consent that Mr. Mackie provided in connection with those registrations (Registration Nos. 3626060 and 6397590) does not constitute his consent for Defendants' usage or other exploitation of his name, image, signature or likeness.

104.    Indeed, one of the registrations is 16 years old, and both registrations are for entirely different classes of goods (fragrances and pillows) than the pending Application (apparel).

105.    Mr. Mackie did not consent to the Application or BMGD's use of his name as a trademark, and he had already made clear to Mr. Schwartz at the end of 2024 that he wished to terminate his business relationship with him and no longer associate his name and brand with

BMDG.  Moreover, in commencing the arbitration, Mr. Mackie made clear that all future business decisions – including whether to register a mark – should go through the Board and therefore required his consent.

106.    Accordingly, on or about July 3, 2025 – promptly after Mr. Mackie learned of the trademark application – he demanded that BMDG withdraw the application pursuant to Section 2(c) of the Lanham Act.  BMDG refused to do so.

107.    In response, on July 11, 2025, BMDG's counsel provided Mr. Mackie's counsel with a purported consent dated February 15, 2015 by which Mr. Mackie purported to grant BMDG the right to use his name and signature as a trademark.

108.    However, Mr. Mackie's signature on the purported consent is a forgery; Mr. Mackie did not personally sign the document, nor does he recall authorizing it to be signed on his behalf.

109.    BMDG later amended the Application to include the purported consent with a forged signature.

110.    The Lanham Act requires that any consent permitting the use of an individual's name, image and likeness be signed by that person.

111.    To the extent his consent was not already implicitly revoked, on July 17, 2025, Mr. Mackie formally revoked in writing any and all consents granted to BMDG to use his name, image, likeness, and signature.  A copy of such revocation is attached hereto as Exhibit B.

112.    BMDG has not withdrawn the Application.

113.    Upon information and belief, Mr. Schwartz caused the Application to be submitted in connection with an agreement it entered into with JCPenney to exploit Mr. Mackie's name, signature and likeness for commercial purposes.

K.    Mr. Schwartz Wrongfully Licenses Mr. Mackie's Name and Signature to JCPenney

114.    On or about September 11, 2025, JCPenney issued a press release and "Lookbook" concerning a new line of clothing bearing Mr. Mackie's name, signature and likeness that JCPenney was going to be advertising, marketing and selling online and in physical retail locations.  The line of clothing is called "Mackie: Bob Mackie" (the "Collection").

115.    On information and belief, on or about September 11, 2025, JCPenney launched the Collection and began selling it both online and in stores.

116.    As a result of JCPenney's press release and "Lookbook," various news organizations published reports about the Collection which gave the impression that Mr. Mackie was working directly with JCPenney on the design of the clothes.  For example, an article entitled "Bob Mackie teams up with JCPenney on a showgirl-worthy line of under $250 looks" was published by Page Six (https://pagesix.com/2025/09/11/style/bob-mackie-collaborated-with-jcpenney-on-an-under-250-collection/); and an article entitled "Unleash your inner showgirl! Shop Bob Mackie x JCPenney sequin dresses, glam gowns and more," with the sub-heading "JCPenney and legendary designer Bob Mackie just launched a Taylor Swift-inspired collection for fall," was published by USA Today (https://www.usatoday.com/story/shopping/2025/09/11/new-jcpenney-bob-mackie-sequin-dresses-gowns/86073121007/)

117.    However, Mr. Mackie has nothing to do with the Collection; he did not authorize it, he did not design any of it, he has had no contact with JCPenney (other than sending a cease and desist letter), and he did not approve or even see in advance the designs for the JCPenney Collection.

118.    Had Mr. Mackie been consulted by Mr. Schwartz (or JCPenney) concerning a potential licensing deal with JCPenney, Mr. Mackie would have refused to provide his consent.

119.    Mr. Mackie knew that when the designer Halston entered into a licensing agreement with JCPenney in the early 1980s, his brand was damaged when high-end fashion retailers stopped carrying his clothes because of Halston's association with JCPenney, a mid-priced retail chain store.  The last thing that Mr. Mackie wants is to diminish the value of his own name and legacy in a similar way.

120.    Upon information and belief, Mr. Schwartz was well aware of Mr. Mackie's views of JCPenney.

121.    Moreover, Mr. Mackie had made crystal clear when he commenced the arbitration proceeding that he wanted and expected Mr. Schwartz to abide by the Bylaws, which required the Board to consent before entering into a business relationship with JCPenney.

122.    Upon information and belief, Mr. Schwartz surreptitiously and without informing Mr. Mackie or his attorneys entered into negotiations with JCPenney and impermissibly authorized the use of Mr. Mackie's name, likeness, image and signature in connection with the Collection without seeking Board approval.  Upon information and belief, Mr. Schwartz did so because he knew that Mr. Mackie would not consent, and that once JCPenney went public with the Collection it would be too late for Mr. Mackie to stop it.

123.    On or about September 15, 2025, Mr. Mackie sent JCPenney a cease and desist letter that included various demands.  A copy of the cease and desist letter was sent to Mr. Schwartz and is attached hereto as Exhibit C.

124.    JCPenney, however, has not ceased exploiting Mr. Mackie's name, signature, and likeness and it has not otherwise complied with Mr. Mackie's demands.

125.    Mr. Schwartz ignored a direct request that he share with Mr. Mackie a copy of the contract between BMDG and JCPenney.

**FIRST CAUSE OF ACTION AGAINST MR. SCHWARTZ:**
**BREACH OF CONTRACT (ACCOUNTING STIPULATION)**

126.    Plaintiff repeats and realleges each of the foregoing allegations as if fully set forth herein.

127.    The Accounting Stipulation is a valid and enforceable contract between Mr. Mackie and Mr. Schwartz.

128.    The Accounting Stipulation requires Mr. Schwartz to produce certain records and financial information of BMDG by September 29, 2025.

129.    Mr. Schwartz breached the Accounting Stipulation by failing to produce any records and financial information.

130.    Mr. Mackie is a 40 per cent shareholder of BMDG and a director, and he has every right to know and understand the state of its finances.  As a result, he was damaged by Mr. Schwartz's breach of the Accounting Stipulation.

131.    The Court should specifically enforce Mr. Mackie's rights under the Accounting Stipulation.

**SECOND CAUSE OF ACTION AGAINST MR. SCHWARTZ:**
**ACCOUNTING UNDER BUSINESS CORPORATION LAW § 720**

132.    Plaintiff repeats and realleges each of the foregoing allegations as if fully set forth herein.

133.    Section 720(a) of the BCL provides that an "action may be brought against one or more directors or officers to procure a judgment . . . to compel the defendant to account for his official conduct in the following cases: (A) The neglect of, or failure to perform, or other violation of his duties in the management and disposition of corporate assets committed to his charge."

134.    Mr. Schwartz is an officer and director of BMDG.

135.    Mr. Schwartz violated his duties as an officer and director by failing to keep accurate financial records of the sources and uses of the funds that were earned by BMDG and loaned to BMDG by himself and other lenders since 2020.

136.    In the alternative to the First Cause of Action, Mr. Schwartz must account for his conduct, including accounting for BMDG's income, and the source of the loans obtained by BMDG at his discretion from 2020 through 2023, and how the income and loan funds in each instance were used.

**THIRD CAUSE OF ACTION AGAINST MR. SCHWARTZ:**
**<u>DIRECT CLAIM FOR BREACH OF FIDUCIARY DUTY</u>**

137.    Plaintiff repeats and realleges each of the foregoing allegations as if fully set forth herein.

138.    As an officer, director, and majority shareholder of BMDG, Mr. Schwartz owes Mr. Mackie a fiduciary duty of loyalty, requiring him to act with undivided loyalty and in good faith.

139.    As part of that duty, Mr. Schwartz was required to consult with Mr. Mackie and obtain his consent before entering into any agreement on behalf of BMDG to license Mr. Mackie's name, image, likeness and signature, or to register any trademarks associated with Mr. Mackie's name.

140.    In violation of that duty, Mr. Schwartz impermissibly licensed Mr. Mackie's name and signature to JCPenney.

141.    Mr. Schwartz knew that Mr. Mackie did not want to engage in any new business with him or BMDG.

142.    The fact that Mr. Schwartz acted surreptitiously and has still failed to provide a copy of the JCPenney contract to Mr. Mackie's indicates that Mr. Schwartz acted in bad faith.

143.    Mr. Schwartz also refused to withdraw the trademark application associated with Mr. Mackie's name even after Mr. Mackie told him that he did not consent to the application.

144.    As a result of the unauthorized JCPenney transaction and the unwithdrawn trademark application, Mr. Mackie has been damaged by Mr. Schwartz in an amount to be proven at trial.  Among other things, the value of Mr. Mackie's designs, name, and brand, which have always been associated with high-end fashion and celebrity performers, is diminished by being associated with a discount department store such as JCPenney.  Mr. Schwartz must also disgorge any profits he received or receives from the JCPenney transaction.

145.    Mr. Schwartz's breach of fiduciary duty is intentional and deliberate and showed blatant and willful disregard for Mr. Mackie's rights.  Mr. Schwartz caused BMDG to enter into a business relationship with JCPenney which exploited Mr. Mackie's career and fame even after Mr. Mackie made clear that he wanted to have no further business with Mr. Schwartz and BMDG and sought an injunction requiring Mr. Schwartz to abide by the terms of the Bylaws.  Mr. Schwartz pursued the trademark application after Mr. Mackie told him he did not consent and asked that it be withdrawn.  Accordingly, Mr. Mackie should be awarded punitive damages as well, in an amount to be proven at trial.

## FOURTH CAUSE OF ACTION AGAINST MR. SCHWARTZ: DERIVATIVE CLAIM FOR BREACH OF FIDUCIARY DUTY

146.    Plaintiff repeats and realleges each of the foregoing allegations as if fully set forth herein.

147.    As a director, officer, and majority shareholder of BMDG, Mr. Schwartz owes it fiduciary duties of loyalty and care.

148.    Between 2020 and 2023, Mr. Schwartz authorized BMDG to take on millions of dollars of debt without Board authorization.  The funds were borrowed from Mr. Schwartz

personally and from third parties.   Thus, Mr. Schwartz engaged in an interested transaction

without informing Mr. Mackie or seeking his approval.

149.    Taking on debt and failing to be able to show how the loans were used constitutes

a breach of Mr. Schwartz's fiduciary duties of loyalty and care.  No ordinarily prudent person in

the same position would act as Mr. Schwartz did under similar circumstances.

150.    Upon information and belief, the manner in which the borrowed funds were used

by Mr. Schwartz constitutes a waste of corporate assets and/or misappropriation.

151.    Moreover, Mr. Schwartz's failure to keep financial records for BMDG is so bad

that the Company has been unable to file taxes since 2022.

152.    The fact that Mr. Schwartz hid the debt from Mr. Mackie and cannot explain how

the funds were used indicates that Mr. Schwartz acted in bad faith.  Indeed, there is no rational

business explanation for taking on so much debt with absolutely nothing to show for it and no

explanation for how the funds were used.  Mr. Schwartz has offered no convincing explanation

for why the debt was taken out; when pressed about the loans his answers have been evasive

and contradictory.

153.    As a result of Mr. Schwartz's breaches, BMDG was damaged in an amount to be

proven at trial but not less than $1 million.

154.    Additionally, to the extent not addressed by the First and Second Causes of

Action, Mr. Schwartz should be ordered to create accurate general ledgers and financial

statements for BMDG.

155.    Demand in this instance would be futile and is therefore excused because Mr.

Schwartz is an interested party who would not consent to authorize an action against himself.

Mr. Schwartz has failed to provide any cogent explanation for his conduct, nor can he.  Mr.

Mackie is therefore not required to make a demand upon BMDG prior to asserting derivative

claims against Mr. Schwartz.

### FIFTH CAUSE OF ACTION AGAINST MR. SCHWARTZ
### BREACH OF BMDG'S BYLAWS

156.    Plaintiff repeats and realleges each of the foregoing allegations as if fully set forth herein.

157.    BMDG's Bylaws constitute a contract between its two shareholders, Mr. Mackie and Mr. Schwartz.

158.    The Bylaws provide that the Board manages and controls BMDG, and that the Board may only act when both directors, Mr. Mackie and Mr. Schwartz, consent.

159.    Upon information and belief, Mr. Schwartz, a director of BMDG, caused BMDG to enter into a material contract with JCPenney, by which BMDG purported to license Mr. Mackie's name and signature to a line of clothing known as *Mackie: Bob Mackie*, without convening a meeting of the Board and obtaining its necessary approval.

160.    Additionally in violation of the Bylaws, Mr. Schwartz proceeded with the application for registration of a trademark involving Mr. Mackie's name without obtaining Board approval.

161.    As of March 6, 2025, when the arbitration was commenced, there could be no doubt that Mr. Mackie wanted and expected all material business decisions to be made by the Board.

162.    As a result of Mr. Schwartz's breach of the Bylaws, Mr. Mackie was damaged in an amount to be proven at trial.

### SIXTH CAUSE OF ACTION AGAINST MR. SCHWARTZ:
### REMOVAL OF MR. SCHWARTZ AS A DIRECTOR OF BMDG
### PURSUANT TO BCL § 706(d)

1.    Plaintiff repeats and realleges each of the foregoing allegations as if they were

fully set forth herein.

2.　　　Section 706(d) of the BCL provides that an "action to procure a judgment removing a director for cause may be brought" by shareholders holding ten percent of the outstanding shares.

3.　　　Mr. Mackie owns 40 per cent of BMDG's stock.

4.　　　Mr. Schwartz failed to maintain accurate books and records for BMDG and failed to cause BMDG to file corporate tax returns since 2022.

5.　　　Mr. Schwartz caused BMDG to incur millions of dollars of debt with no ability to account for how the funds were used.  A significant portion of the loans were from Mr. Shwartz, and therefore constituted an interested transaction.  No board approval was obtained for the loans.

6.　　　Mr. Schwartz breached the Bylaws by causing BMDG to enter into a material contract with BMDG without obtaining Board consent and seeking to register Mr. Mackie's name as a trademark over Mr. Mackie's objection.

7.　　　A sufficient basis exists to remove Mr. Schwartz from the Board for cause. Accordingly, pursuant to BCL § 706(d), Mr. Schwart should be removed as a director of BMDG.

## SEVENTH CAUSE OF ACTION AGAINST MR. SCHWARTZ: REMOVAL OF MR. SCHWARTZ AS AN OFFICER OF BMDG PURSUANT TO BCL § 716(c)

8.　　　Plaintiff repeats and realleges each of the foregoing allegations as if fully set forth herein.

9.　　　Section 716(c) of the BCL provides that an "action to procure a judgment removing an officer for cause may be brought" by shareholders holding ten percent of the outstanding shares.

10.　　　Mr. Mackie owns 40 per cent of BMDG's stock.

11.     Mr. Schwartz failed to maintain accurate books and records for BMDG and failed to cause BMDG to file corporate tax returns since 2022.

12.     Mr. Schwartz caused BMDG to incur millions of dollars of debt with no ability to account for how the funds were used.  A significant portion of the loans were from Mr. Shwartz, and therefore constituted an interested transaction.  No board approval was obtained for the loans.

13.     Mr. Schwartz breached the Bylaws by causing BMDG to enter into a material contract with BMDG without obtaining Board consent and seeking to register Mr. Mackie's name as a trademark over Mr. Mackie's objection.

14.     A sufficient basis exists to remove Mr. Schwartz from his position as an officer of for cause. Accordingly, pursuant to BCL § 716(c), Mr. Schwart should be removed as an officer of BMDG.

### EIGHTH CAUSE OF ACTION AGAINST MR. SCHWARTZ AND BMDG: DECLARATORY JUDGMENT

15.     Plaintiff repeats and realleges each of the foregoing allegations as if fully set forth herein.

16.     Mr. Schwartz asserts that BMDG owns a physical "Archive" of materials that were transferred from the Mackie Businesses in or about March 2007, including, among other things, Mr. Mackie's original sketches (the tangible items and related intellectual property). Upon information and belief, Mr. Schwartz contends that the Archive also holds materials created by Mr. Mackie after the formation of BMDG in 1997.

17.     There are no documents recording any transfer of any physical or intellectual property to BMDG from any of the Mackie Businesses.

18.     Upon information and belief, the copyrights purportedly transferred from certain

Mackie Businesses to BMDG may not have been owned by the Mackie Businesses.

19.    Mr. Mackie was never an employee of BMDG, nor did he ever sign any work-for-hire agreement with the BMDG.

20.    As a result, Mr. Mackie asserts that BMDG does not own the physical items include in the Archive, and any of the associated intellectual property (including the copyright therein).

21.    Mr. Schwartz, and through him BMDG, also asserts that BMDG has the right to register trademarks involving Mr. Mackie name, likeness, or signature.

22.    However, BMDG has no rights to register trademarks involving his name.

23.    An actual and justiciable controversy between genuine disputants now exists concerning what physical items, copyrights, trademarks, Mr. Mackie's right of privacy and publicity (a/k/a name, image and likeness rights) and other intellectual property are owned by BMDG, and what rights BMDG has to use or register trademarks associated with the name "Bob Mackie" and derivatives thereof.

24.    The Court should declare (i) that Mr. Mackie, not BMDG, is the owner of the physical sketches, is the author and owner of the copyright (and any other intellectual property therein), and any other items that were created prior to the formation of BMDG in 1997, as well as any items contained in the Archive that were not made pursuant to any work for hire or other agreement between Mr. Mackie and BMDG or any third party, and (ii) that any trademarks associated or otherwise with the name "Bob Mackie," including without limitation BOB MACKIE and Mr. Mackie's iconic signature, belong to Mr. Mackie and not BMDG.

25.    Additionally, Mr. Mackie seeks to enjoin the Application from proceeding before the USPTO and from becoming a registered trademark, and a declaration that BMDG has committed a fraud upon the USPTO with respect to BMDG's currently pending application to

register the mark BOB MACKIE (U.S. Serial No. 99205718: filed May 28, 2025) by submitting one or more documents that include a forgery and by falsely implying that Mr. Mackie has given his written consent for the Application when in fact Mr. Mackie was never even asked to provide any such consent.

26.     Mr. Mackie further seeks a declaration that the purported consents submitted in connection with the Application are null and void for all purposes, including without limitation in connection with the trademark registrations with which they were originally submitted to the USPTO.

**NINTH CAUSE OF ACTION AGAINST MR. SCHWARTZ:**
**<u>ACCOUNTING</u>**

27.     Plaintiff repeats and realleges each of the foregoing allegations as if fully set forth herein.

28.     In 2014, Mr. Mackie granted Mr. Schwartz the POA, by which Mr. Schwartz gained access to all of Mr. Mackie's personal bank accounts and took charge of paying Mr. Mackie's bills and overseeing his personal finances, including the preparation and filing of his tax returns.

29.     On September 20, 2024, Mr. Mackie demanded that Mr. Schwartz provide a full and complete accounting of all transactions that he had entered into on behalf of Mr. Mackie or members of his family (e.g., his great-grandchildren), for the past six years.  Mr. Schwartz failed to do so.

30.     As Mr. Mackie's attorney-in-fact and fiduciary, Mr. Schwartz is legally required to account upon Mr. Mackie's demand.

31.     Accordingly, Mr. Schwartz must provide an accounting to Mr. Mackie.

**TENTH CAUSE OF ACTION AGAINST MR. SCHWARTZ:**
**<u>BREACH OF THE ARBITRATION AGREEMENT</u>**

32.     Plaintiff repeats and realleges each of the foregoing allegations as if fully set forth herein.

33.     The Arbitration Agreement is a valid agreement between Mr. Mackie and Mr. Shwartz.

34.     Pursuant to the Arbitration Agreement, Mr. Mackie and Mr. Schwartz agreed to split equally all fees charged by the AAA, including the arbitrator's fee.

35.     Mr. Mackie paid $11,172 to the AAA; Mr. Schwartz failed to pay his share, thus causing the arbitrator to terminate the arbitration.

36.     Mr. Schwartz waived arbitration by failing to pay the arbitration fees.

37.     As a result of Mr. Schwartz's breach of the Arbitration Agreement, Mr. Mackie was damaged in the amount of $11,172.

### ELEVENTH CAUSE OF ACTION AGAINST MR. SCHWARTZ
### FRAUD IN THE INDUCEMENT

38.     Plaintiff repeats and realleges each of the foregoing allegations as if fully set forth herein.

39.     On March 6, 2025, Mr. Schwartz induced Mr. Mackie to enter into the Arbitration Agreement by promising the pay half of the fees and costs, including the arbitrator's fees.

40.     At the time he entered into the Arbitration Agreement, Mr. Schwartz had neither the intent and/or the ability to pay his share of the fees, but he hid this fact from Mr. Mackie. Upon information and belief, Mr. Schwartz wanted Mr. Mackie to sign the arbitration agreement in the hopes that by delaying payment long enough, he could delay resolution of this matter and allow him to consummate the JCPenny transaction.  He also knew that Mr. Mackie wanted to keep this dispute between himself and Mr. Schwartz private.

41.     Mr. Mackie reasonably and justifiably relied on Mr. Schwartz's representation

that he would pay his share of the fees.  Mr. Mackie would not otherwise have entered into the Arbitration Agreement.

42.    Mr. Schwartz failed to pay his share of the fees and the arbitration was terminated.  As a result, Mr. Mackie was damaged in an amount to be proven at trial, but not less than $20,000, which is the amount he paid his lawyers in connection with the arbitration proceeding.

### TWELFTH CAUSE OF ACTION AGAINST MR. SCHWARTZ AND BMDG: <u>PERMANENT INJUNCTION</u>

43.    Plaintiff repeats and realleges each of the foregoing allegations as if fully set forth herein.

44.    Mr. Schwartz and BMDG have ignored Mr. Mackie's demand that they withdraw the Application.

45.    As a result, the Court should permanently enjoin Mr. Schwartz and BMDG from applying to register, from obtaining trademark registrations for (including for the Application), and from using or otherwise exploiting (with or without a trademark registration), for any and all classes of goods and/or services and for any other commercial or non-commercial purposes, any trademark (word mark, stylized, or otherwise) that incorporates Mr. Mackie's name (in whole or in part), signature, image or likeness, or that is likely to cause confusion as to Mr. Mackie's endorsement, sponsorship or approval of the goods and/or services, including without limitation BOB MACKIE, MACKIE, Mr. Mackie's signature, and any combinations and/or portions thereof.

### <u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiff prays for relief as follows:

A.    An order directing Mr. Schwartz to comply with the Accounting Stipulation, or, in the alternative, providing an accounting of his conduct under BCL § 720 and creating general ledgers and financial statements for BMDG for all years for which they are missing;

B.    An award of compensatory damages resulting from Mr. Schwartz's breaches of his fiduciary duties and the Bylaws in an amount to be proven at trial;

C.    An award of punitive damages resulting from Mr. Schwartz's breach of his fiduciary duties with respect to the JCPenney transaction and failure to withdraw the Application;

D.    An award of compensatory damage resulting from Mr. Schwartz's breach of the arbitration agreement in an amount not less than $11,172;

E.    An award of compensatory damages resulting from Mr. Shwartz's fraud in the inducement in an amount not less than $20,00;

F.    An award removing Mr. Schwartz as a director and officer of BMDG;

G.    Pursuant to 15 U.S.C. § 1119, for lack of Mr. Mackie's written consent as required by section 2(c) of the Lanham Act (15 U.S.C. § 1052(c)), cancelling LIVE federal trademark Registration No. 3626060 (BOB MACKIE), cancelling LIVE federal trademark Registration No. 6397590 (BOB MACKIE), declaring that Defendants may not obtain a federal trademark registration for LIVE Serial No. 99205718 (BOB MACKIE) and enjoining the Application from proceeding, and further declaring that the purported consents filed with the United Stated Patent and Trademark Office (USPTO) in connection with those registrations/applications are null and void for all purposes; or in the alternative, declaring that the consents submitted in connection with those registrations/applications (Registration Nos. 3626060 and 6397590 and Serial No. 99205718 ) are limited to only those goods/services for which the marks have registered (international classes 003 [fragrances] and 020 [pillows], and

that such consents may not be used in connection with any other good/services or in connection with applications for registrations of any other marks for any other goods/services (including without limitation international classes 014 and 025) and that such consents also may not be used or exploited by Defendants for any other purposes;

      H.      Permanently enjoining Defendants, and those acting in concert with them, from applying to register, from obtaining trademark registrations for (including for the Application), and from using or otherwise exploiting (with or without a trademark registration), for any and all classes of goods and/or services and for any other commercial or non-commercial purposes, any trademark (word mark, stylized, or otherwise) that incorporates Mr. Mackie's name (in whole or in part), signature, image or likeness, or that is likely to cause confusion as to Mr. Mackie's endorsement, sponsorship or approval of the goods and/or services, including without limitation BOB MACKIE, MACKIE, Mr. Mackie's signature, and any combinations and/or portions thereof;

      I.      Declaring that Defendants have abandoned (as defined in 15 U.S.C. § 1127) all trademarks (word mark, stylized, or otherwise) and related trademark registrations that incorporate Mr. Mackie's name (in whole or in part), signature, image or likeness, including without limitation BOB MACKIE, MACKIE, Mr. Mackie's signature, and any combinations and/or portions thereof, in connection with all goods and/or services, for which Defendants have not used the mark for three consecutive years and/or which Defendants have discontinued using and for which Mr. Mackie does not intend to resume using in relation to Defendants, including all Bob Mackie-related marks associated with federal registrations/applications-for-registration that are identified by the USPTO as "DEAD" (Registration Numbers 1402250, 1811905, 1940358, 1250291, 1141656, 1145809, 1387192, 1823766, 3464000, 1325937, 2155562, and 4515428; and Serial Numbers 75846460, 86873548 and 75482097);

J.      Declaring that, pursuant to 17 U.S.C. § 201, Defendants are not the authors of the Archive (in whole or in part) and that ownership of the copyright in the Archives has not been transferred to Defendants;

K.      Declaring that Defendants do not own the physical items in the Archive;

L.      An order directing Mr. Schwartz to account to Mr. Mackie concerning all transactions that he entered into on behalf of Mr. Mackie or members of his family for the past six years.

M.      For an order awarding such other and further relief the Court may deem just and proper.

## <u>REQUEST FOR JURY TRIAL</u>

Mr. Mackie requests a jury trial on all the issues so triable.  This request is without prejudice to, or waiver of, Mr. Mackie's right to move for judgment on all issues that may be decided by the Court.


DATED:   New York, NY
          October 30, 2025

FIRESTONE GREENBERGER PLLC


By:  /s/ *Michael J. Firestone*
     Michael J. Firestone
     Jordan Greenberger
     Callie J. Kramsky
     104 W. 40th Street, 4th Floor
     New York, NY 10018
     Telephone:  (212) 597-2255

     *Attorneys for Plaintiff*